**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **No. 19-cv-3244** |
| **Plaintiff,** | **COMPLAINT** |
| **v.** | **JURY TRIAL DEMANDED** |
| **ABRAAJ INVESTMENT MANAGEMENT LIMITED, and ARIF NAQVI,** | |
| **Defendants.** | |

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against Abraaj Investment Management Limited ("Abraaj Investment Management") and Arif Naqvi ("Naqvi") (collectively "Defendants"), alleges as follows:

<u>**SUMMARY OF ALLEGATIONS**</u>

1.      Abraaj Investment Management, an investment adviser operating in Dubai, United Arab Emirates ("UAE"), and its founder, Naqvi, defrauded the Abraaj Growth Markets Health Fund ("Abraaj Health Fund" or "Fund") and United States investors by misappropriating over $230 million in Fund money from at least September 2016 until at least June 2018 ("Relevant Period").  While Abraaj Investment Management and Naqvi falsely reported to the Abraaj Health Fund and its investors that their money would be invested in health care-related businesses in emerging markets, Abraaj Investment Management – under Naqvi's control – misappropriated the money to cover cash shortfalls at Abraaj Investment Management and its parent company, Abraaj Holdings Ltd. ("Abraaj Holdings"), a separate entity that Naqvi largely owned and controlled.

2.     Defendants' materially false statements, omissions, and deceptive acts violated the anti-fraud provisions of the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b-1-21.  The Commission respectfully requests, among other things, that the Court enjoin Defendants from committing further violations of the Federal securities laws as alleged in this Complaint, and order Defendants to pay disgorgement, plus prejudgment interest, and a monetary penalty based upon these violations.

## JURISDICTION AND VENUE

3.     The Court possesses jurisdiction over this action pursuant to Sections 209(d) and 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(d) & (e).

4.     Venue lies in this District pursuant to Section 214 of the Advisers Act, 15 U.S.C. § 80b-14, because certain of the transactions, acts, practices and courses of conduct constituting the violations alleged herein occurred within the Southern District of New York.  Among other things, the Investor Relations Office that supported Abraaj Investment Management and the Abraaj Health Fund was located in this District, as well as the Fund's largest United States investor.

5.     In connection with the unlawful conduct alleged in this Complaint, Defendants solicited and sold partnership interests in the Abraaj Health Fund to United States investors with whom Defendants maintained regular communication by providing, for example, false or materially misleading audited financial statements and Quarterly Reports.  United States investors were also members of the Fund's Limited Partner Advisory Committee ("LPAC") and attended committee meetings during the Relevant Period, including at least one LPAC meeting that occurred in this District.  These United States investors transmitted capital contributions to the Abraaj Health Fund from bank accounts in the United States, including at least one bank in

this District.  Defendants' unlawful conduct abroad had a foreseeable substantial effect within

the United States because the deceptive acts involved substantial sums of money contributed by

United States investors, and Defendants transmitted misleading information to investors in the

United States.  Further, Defendants made use of the means or instrumentalities of interstate

commerce, and made use of the means or instruments of transportation or communication in

interstate commerce, and of the mails.

## **DEFENDANTS**

6.      **Abraaj Investment Management**, an exempt reporting investment adviser with

the Commission, is a UAE-based and Cayman Islands-incorporated exempted, limited liability

company, and wholly owned subsidiary of Abraaj Holdings.  Abraaj Investment Management is

the Investment Adviser and Manager to, among other private equity funds, the Abraaj Health

Fund.  Abraaj Investment Management voluntarily declared bankruptcy and entered liquidation

proceedings in or around June 2018, in the Grand Court of the Cayman Islands.

7.      **Naqvi**, age 59, is a Pakistani national.  He is the founder and largest owner of

Abraaj Holdings, which is the sole owner of Abraaj Investment Management.  Naqvi exercised

substantial control over Abraaj Holdings, Abraaj Investment Management, and the Abraaj Health

Fund.  According to the Abraaj Health Fund's private placement memorandum, Naqvi was the

"Head of the Fund" who "led the design of the [Fund] concept and the strategy and business

plan," and was one of two senior executives responsible for "overseeing the Fund's activities."

During the Relevant Period, Naqvi was paid substantial sums from Abraaj Holdings and Abraaj

Investment Management.

## RELEVANT ENTITIES

8.      **Abraaj Group** was the informal name for a large group of related entities consisting of private equity funds, their general partners, investment advisers, and other entities that Naqvi founded in 2002, and included Abraaj Holdings and Abraaj Investment Management. As of 2018, the Abraaj Group reportedly managed over $13 billion in numerous private equity and other funds that were typically structured as limited partnerships that included United States investors.

9.      **Abraaj Holdings** is a UAE-based, Cayman Islands-incorporated exempted limited liability company that Naqvi founded in 2002.  Naqvi was its largest owner.  It serves as the Abraaj Group's top-level holding company and owns numerous entities, including Abraaj Investment Management, other investment adviser entities, and certain private equity funds' general partners.  Abraaj Holdings also has limited partnership interests in Abraaj Group-managed funds, and portions of some of the funds' investment portfolio companies.  Abraaj Holdings voluntarily declared bankruptcy and entered liquidation proceedings in or around June 2018, in the Grand Court of the Cayman Islands.

10.      **Abraaj Health Fund** is a private equity fund registered in the Cayman Islands.  It was structured as a limited partnership formed to invest in businesses operating in the healthcare and related sectors in emerging markets.  Abraaj Investment Management owned and controlled the Fund's general partner ("General Partner").  The Abraaj Health Fund's first investor closing date was on September 30, 2015, and its final close was on July 31, 2016, with a total commitment of $850 million by, among others, United States investors who became limited partners in the Fund.  On August 18, 2017, a United States governmental entity committed an additional $150 million debt investment through a finance agreement.  The Abraaj Health Fund

had several bank accounts in the name of various entities it owned or controlled ("Abraaj Health Fund Bank Accounts").  Abraaj Investment Management and Naqvi served as the Abraaj Health Fund's investment adviser until mid-2018.  In Form D filings with the Commission, the Abraaj Health Fund claimed it was exempted from registration with the Commission because it was a pooled investment vehicle excluded from the definition of an "investment company" in the Investment Company Act of 1940, 15 U.S.C. §§ 80a-1-64, pursuant to Sections 3(c)(1) and 3(c)(7) of the Act, 15 U.S.C. § 80a-3(c)(1) & (7).

## FACTUAL ALLEGATIONS

I.   **Abraaj Investment Management And Naqvi Were Investment Advisers Who Owed Fiduciary Duties To The Abraaj Health Fund**

11.     The Abraaj Health Fund was primarily engaged in, held itself out as being primarily engaged in, and proposed to engage itself primarily in the business of investing, reinvesting, and/or trading in securities.  According to the Abraaj Heath Fund limited partnership agreement ("HFLPA"), the "purpose of the [Abraaj Health Fund] is to carry on the business of an investor investing in a combination of control and minority investments in existing businesses and new businesses in the healthcare and related sectors," including, but not limited to, the purchase and sales of securities in portfolio companies.

12.     Abraaj Investment Management was the Manager and Investment Adviser to the Abraaj Health Fund.  Abraaj Investment Management and Naqvi advised the Fund as to the specific portfolio companies to target, the value of those portfolio companies, and the advisability of investing in, purchasing, and selling the securities of such portfolio companies.  Abraaj Investment Management and Naqvi controlled the purchase and sale of the portfolio companies held by the Abraaj Health Fund.

13.     Throughout the Relevant Time period, Abraaj Investment Management and Naqvi made investment decisions for the Abraaj Heath Fund through a committee called the Global Investment Committee ("GIC").  The GIC evaluated and recommended investment opportunities to the Abraaj Group's private equity funds, including the Abraaj Health Fund, as well as monitored the performance of their investments, and, when appropriate, developed and recommended disposition strategies.  The GIC was a committee of up to seven members, five of which were permanent.  Naqvi was the GIC's Chairman throughout the Relevant Period.  The GIC's investment decisions required a unanimous vote, but Naqvi, as Chairman, had veto power and also could override one dissenting vote.

14.     Abraaj Investment Management and Naqvi received compensation for their investment adviser services to the Abraaj Heath Fund.

15.     As the Abraaj Health Fund's investment advisers, Abraaj Investment Management and Naqvi owed fiduciary duties to the Fund.

## II.     Abraaj Investment Management And Naqvi Misappropriated Over $230 Million From The Abraaj Health Fund

16.     The Abraaj Health Fund was a private equity fund formed as a limited partnership in 2015, and managed by Abraaj Investment Management and Naqvi.  The Fund's largest investor was based in this District, and other United States-based investors were among the limited partners, including a large charitable foundation and several other charitable organizations.  The Fund was formed to primarily make investments in the securities of health care-related businesses such as hospitals and treatment centers in emerging markets.

17.     According to the HFLPA, Abraaj Investment Management was authorized to take all necessary or desirable actions in connection with the operation of the Fund, the management of the Fund's investment portfolio or otherwise in the furtherance of the Fund's business.  In

accordance with these directives, Abraaj Investment Management was entitled to (i) drawdown limited partner capital commitments to make specific investments for the fund; (ii) collect Fund expenses not to exceed $2.5 million; and (iii) receive an adviser or management fee equal to two per cent per annum of the commitment of each such investor.  The HFLPA also required that Abraaj Investment Management refer all actual or potential conflicts of interest to the LPAC.

18.     Naqvi had signatory authority on all Abraaj Health Fund Bank Accounts, as well as Abraaj Holdings' and Abraaj Investment Management's bank accounts.  Pursuant to this authority, Naqvi was a required signatory on all transfers in excess of $75 million.

19.     The General Partner periodically issued drawdown notices to investors that informed each investor of the amount of their committed capital that was being drawn down, where to send the drawn down funds, and how their investment would be used.  For example, in November 2016, and in March 2017, the General Partner provided notices of drawdowns totaling $415 million and $115 million, respectively, that it claimed would be used to fund specific portfolio company transactions, fees, and expenses.

20.     According to Abraaj Investment Management's Quarterly Report to investors for the third quarter of 2017, the limited partners paid approximately $544 million in capital contributions pursuant to drawdowns.  According to the report, however, Abraaj Investment Management had invested only approximately $265 million in Fund portfolio companies, leaving hundreds of millions of capital uninvested and still available for the Fund's use.  It also informed investors that the Abraaj Health Fund had, to date, paid Abraaj Investment Management $37.6 million in management fees and $2.5 million in expenses.

21.     Abraaj Investment Management's emails, bank records, and internal finance documents, however, reflect that Defendants were not using the Abraaj Health Fund's money as

required by the HFLPA, as described in the Fund's written disclosures to investors, and in the investor drawdown notices.  Instead, Abraaj Investment Management and Naqvi were identifying and acknowledging that Abraaj Holdings and Abraaj Investment Management were suffering significant cash shortfalls, and then misappropriating Fund money to cover the shortfalls and pay for items such as Abraaj Holdings' debt obligations.  These material facts were not disclosed to the Fund, its investors, or the LPAC in the Abraaj Investment Management's Quarterly Reports, the Fund's audited financial statements, or otherwise.

### A. By December 2016, Abraaj Investment Management and Naqvi Began to Misappropriate Money from the Abraaj Health Fund

22.     In December 2016, Abraaj Investment Management transferred $100 million of Abraaj Health Fund money from an Abraaj Health Fund Bank Account to an Abraaj Holdings bank account, and $40 million to an Abraaj Investment Management bank account.  These transfers were in addition to the management fees and expense reimbursements to which Abraaj Investment Management was entitled.  As a required signatory for all bank transfers over $75 million, Naqvi at least approved the $100 million transfer to Abraaj Holdings.

23.     On January 3, 2017, the Abraaj Group's Managing Director of Finance ("Managing Director") informed Naqvi and the Abraaj Group's Head of Finance and Operations ("Finance Head") by email that Abraaj Holdings was expected to have a cash shortfall of $85 million by the end of March 2017.  The Managing Director noted that this cash shortfall would occur despite the $140 million recently taken from the Abraaj Health Fund, which he described in the email as $128.5 million "borrowed" from the Abraaj Health Fund, and an $11.5 million "receivable" involving Abraaj Holdings.  Neither the loan nor the receivable were disclosed to the Fund, its investors, or the LPAC on Abraaj Investment Management's Quarterly Report to

Abraaj Health Fund investors for the fourth quarter of 2016, the Fund's audited financial statements for the period ending June 30, 2017, or otherwise.

24.     The Managing Director further noted in his January 3, 2017 email that the Abraaj Health Fund's cash requirements for the first quarter of 2017 were approximately $173 million if it included all investments identified in Abraaj Investment Management's prior drawdown notices to investors.  The Managing Director, however, noted that the Abraaj Health Fund only had an available balance of $111.5 million.  Despite this approximately $62 million shortfall, the Managing Director did not recommend that they return the $140 million already misappropriated by Abraaj Holdings and Abraaj Investment Management.

25.     On January 19, 2017, Naqvi responded that he had not had time to review the Managing Director's analysis, but he authorized the Managing Director and the Finance Head to use "their common sense to process and just don't shut down the business!"  Naqvi also promised to discuss later when he became available.

26.     On February 16, 2017, the Managing Director emailed Naqvi and the Finance Head a portion of Abraaj Holdings' cash balance spreadsheet, and he concluded that the Abraaj Group would have a cash shortfall of $4.2 million that month and so they would draw $5 million from the Abraaj Health Fund to cover it.  The email also included a capital contribution drawdown chart for the Abraaj Health Fund demonstrating that the $140 million that had been transferred from the Abraaj Health Fund to Abraaj Investment Management and Abraaj Holdings in December 2016, remained outstanding.  The Managing Director further noted that the next Abraaj Health Fund investor drawdown would occur around the end of the first quarter of 2017.

27.     On or about March 15, 2017, the General Partner sent investors a drawdown notice requesting an additional $115 million from the Abraaj Health Fund limited partners,

claiming the money would fund five portfolio company investments – even though Abraaj
Investment Management had already misappropriated well in excess of that amount.
Furthermore, the drawdown notice named these investments as "follow-on investments," but
internal Abraaj Group financial documents and bank records reflect that, by March 15, 2017,
Abraaj Investment Management had, in fact, only sent funds to two of these five portfolio
companies.

28.      In addition, on or about March 15, 2017, Abraaj Investment Management
transferred another $8 million of Abraaj Health Fund investor money from an Abraaj Health
Fund Bank Account to an Abraaj Investment Management bank account.  These funds did not
constitute Abraaj Investment Management's fees or expenses to which it was entitled pursuant to
the HFLPA.

29.      Nor did Abraaj Holdings or Abraaj Investment Management return the previously
misappropriated money to the Abraaj Health Fund.  Rather, between March 21 and March 30,
2017, Abraaj Investment Management transferred *another* $16 million from an Abraaj Health
Fund Bank Account to an Abraaj Investment Management bank account.  These funds did not
constitute Abraaj Investment Management's fees or expenses to which it was entitled pursuant to
the HFLPA.

30.      Abraaj Investment Management's March 2017 transfers totaling $24 million in
Abraaj Health Fund money were not disclosed to the Fund, its investors, or the LPAC in Abraaj
Investment Management's Quarterly Reports to investors for the first quarter of 2017, the Fund's
audited financial statements for the period ending June 30, 2017, or otherwise.  Abraaj
Investment Management's Quarterly Report for the first quarter of 2017, reported that it received
only $4.2 million in management fees and had no Fund expenses in that quarter.

31.    On or about June 3, 2017, the Managing Director reported to Naqvi and the Finance Head that Abraaj Holdings and Abraaj Investment Management expected to have a $255 million payable to the Abraaj Health Fund by the end of the fiscal period ending June 30, 2017.

32.    On September 12, 2017, the Managing Director sent Naqvi and the Finance Head an Abraaj Group a cash flow update by email, noting that a $68 million drawdown of investor funds from the Abraaj Health Fund would be available to cover Abraaj Holdings' and Abraaj Investment Management's upcoming expenses, including Abraaj Holdings' debt obligations.

33.    In the September 12, 2017 email, the Managing Director further informed Naqvi that the Abraaj Group's expenses that he identified did not include $58 million needed to fund investments in three portfolio companies for the Abraaj Health Fund in October 2017.  Instead, the Managing Director asked Naqvi to assist him by "delaying these deals" so that the money could be used for non-Abraaj Health Fund expenses.  Abraaj Group internal financial documents and bank statements reflect that the Abraaj Health Fund's investments in these three portfolio companies were, in fact, delayed past October 2017.

34.    In total, from December 2016, through at least September 2017, Abraaj Investment Management – with the knowledge and authorization of Naqvi – transferred at least $230 million from Abraaj Health Fund Bank Accounts to Abraaj Holdings and Abraaj Investment Management that was not authorized pursuant to the HFLPA.  This money was comingled with other Abraaj Holdings' and Abraaj Investment Management's funds and used as needed for Abraaj Holdings' and Abraaj Investment Management's corporate expenses or other non-Abraaj Health Fund purposes.

35.    The HFLPA did not authorize these transfers from the Abraaj Health Fund to Abraaj Holdings and Abraaj Investment Management.  Rather, contrary to the HFLPA, Abraaj

Investment Management's undisclosed transfers of investor funds from the Abraaj Health Fund to itself and to Abraaj Holdings to cover their cash shortfalls were not related to the operation of the Fund, the management of the Fund's investment portfolio, or otherwise in the furtherance of the Fund's business.  Further, those transfers far exceeded the $37.6 million in management fees and $2.5 million in expenses that Abraaj Investment Management disclosed to investors in its Quarterly Manager's Report for the third quarter of 2017.

36.     By conduct including, but not necessarily limited to that described above, Naqvi knew, authorized, directed, and permitted the Managing Director and others to go forward with keeping his businesses – Abraaj Holdings and Abraaj Investment Management – afloat when he knew, was reckless in not knowing, or should have known that Abraaj Health Fund money was used and would be used to fund the cash shortfalls at Abraaj Holdings and Abraaj Investment Management.  Abraaj Investment Management's and Naqvi's misappropriations of Fund money were not in the best interests of the Fund because, among other things, Fund investments were delayed due to the misappropriations, and the misappropriations created investment risks not disclosed to the Fund, its investors, or the LPAC.  In addition, Abraaj Investment Management's and Naqvi's misappropriations of Fund money constituted conflicts of interest and related party transactions between themselves and their client, the Fund, which they failed to disclose to the Fund, its investors, or the LPAC in violation of the HFLPA.  By these actions and omissions, Abraaj Investment Management and Naqvi breached their fiduciary duties to the Fund.

**B.      Abraaj Investment Management and Naqvi Took Affirmative Steps to Conceal Their Misappropriations**

37.     Abraaj Investment Management and Naqvi also took affirmative steps to conceal their misappropriations from investors.  One incident occurred in connection with the Fund's initial audited financial statements for the period ending June 30, 2017.  On June 3, 2017, the

Managing Director emailed Naqvi and the Finance Head regarding the upcoming audit for the Abraaj Health Fund, Abraaj Holdings, and other related entities, and noted several "potential audit issues" to discuss in their upcoming meeting on June 10, 2017.  Among other things, the Managing Director reported to Naqvi and the Finance Head that Abraaj Holdings and Abraaj Investment Management expected to have a $225 million payable to the Abraaj Health Fund at fiscal period end and would have to "arrange for cash for . . . [the Abraaj Health Fund] audit." Naqvi and the Managing Director, copying the Finance Head, then considered, as an alternative, whether they could change the Abraaj Health Fund's fiscal period end to December 31, 2017, to avoid having to release audited financial statements for another six months.  The Managing Director, however, concluded that they could not change the date.

38.     Ultimately, the Abraaj Health Fund's audited financial statements for the period ending June 30, 2017, reported that the Fund had $167 million in cash in an Abraaj Health Fund Bank Account.  The financial statements further reported that this amount consisted of the uninvested capital drawdowns from the Fund's limited partners.

39.     The $167 million cash balance, however, was, in fact, part of a $196 million loan from a non-United States publicly traded airline ("Airline") in which Naqvi served as a director. On June 24, 2017, the Airline made a short-term 30-day loan to the General Partner that was used to cover the hole in the Fund's balance sheet left by the transfer of Fund money to Abraaj Holdings and Abraaj Investment Management earlier in the year.  Naqvi also signed the loan agreement because he personally guaranteed the repayment of the loan.

40.     On July 19, 2017, which was shortly after the Fund's June 30, 2017 period-end, Abraaj Investment Management and Naqvi authorized the transfer of $196 million back to the Airline, which left only about $28 million in the Abraaj Health Fund Bank Account.  Naqvi

authorized at least this transfer because he was a required signatory on all transfers over $75 million.

41.     Defendants also made misleading statements directly to Abraaj Health Fund investors.  By October 2017, Abraaj Health Fund investors were raising concerns with Abraaj Investment Management about the whereabouts of their capital contributions, as they had contributed $544 million, but only approximately $265 million had actually been invested.  For example, on October 15, 2017, the Chief Financial Officer of the Abraaj Health Fund emailed the Abraaj Health Fund's LPAC, which included United States investors, and represented that, at the time, the Abraaj Health Fund had "an available cash balance" of $225.9 million in uninvested funds in its bank accounts.  That statement was false; at the time, there was only approximately $13 million in Abraaj Health Fund Bank Accounts.

42.     On or around October 22, 2017, Naqvi emailed a large United States investor who raised questions regarding the location of the Abraaj Health Fund's uninvested capital, and Naqvi claimed that Abraaj Investment Management had "decided to keep the uninvested amounts with us" and "keep[] the drawn funds in place" as they await to deploy capital to investments that Naqvi claimed were "slightly delayed for reasons beyond our control."  Naqvi's statements were misleading because (1) the money was not in the Abraaj Health Fund Bank Accounts, but had been transferred to Abraaj Holdings and Abraaj Investment Management; and (2) Naqvi had purposely delayed funding three Abraaj Health Fund investments rather than return the misappropriated Fund money from Abraaj Holdings and Abraaj Investment Management.

43.     In or around February 2018, Naqvi admitted to the head of investments at one United States investor that Abraaj Health Fund capital contributions were used for Abraaj Holdings' and Abraaj Investment Management's general corporate purposes.

44.     In or around February 2018, Abraaj Investment Management falsely claimed to a consultant hired by Abraaj Health Fund investors, including United States investors, that the misappropriated money alleged in this Complaint were "Temporary Investments" as permitted by the HFLPA.  They were not.  Abraaj Investment Management and Naqvi transferred the Fund money to Abraaj Holdings and Abraaj Investment Management and used for non-Health Fund-related purposes without any regard for being returned to investors when needed in furtherance of the Fund's investments.  Indeed, Abraaj Investment Management chose to either drawdown additional investor funds or otherwise delay investments rather than repay monies owed to the Fund.  Further, neither Abraaj Investment Management's Quarterly Reports nor the Fund's audited financials disclosed any demand deposit accounts or any interest paid on such accounts. Abraaj Holdings' and Abraaj Investment Management's internal financial records also did not track any interest that Abraaj Holdings was purportedly paying on these accounts until on or around January 2018 – *after* investors raised questions about Abraaj Investment Management's use of Fund money.

45.     In late 2017 and early 2018, following months of investor demands with regard to the location of their cash capital contributions, Abraaj Investment Management ultimately returned much of the money it misappropriated, as well as over $13 million in interest to the Abraaj Health Fund investors.

46.     Naqvi knew, was reckless in not knowing, or should have known that using Abraaj Health Fund money to fund cash shortfalls at Abraaj Holdings and Abraaj Investment

Management and failing to disclose these cash transfers and the conflicts of interest that they created in Abraaj Investment Management's 2016 and 2017 Quarterly Reports, the Fund's audited financial statements, or otherwise, deceived and defrauded the Fund and its investors. By reason of Naqvi's knowledge, or his reckless or negligent disregard of the transfers of Abraaj Health Fund money to cover Abraaj Holdings' and Abraaj Investment Management's cash flow shortfalls, and Defendants' failure to disclose such transfers in Abraaj Investment Management's 2016 and 2017 Quarterly Reports, the Fund's audited financial statements, or otherwise, Abraaj Investment Management and Naqvi knowingly, recklessly, or negligently breached their fiduciary duties to the Abraaj Health Fund, and deceived and defrauded the Fund and its investors.

47.     Defendants' knowledge, or reckless or negligent disregard of their transfers of Abraaj Health Fund money to cover Abraaj Holdings' and Abraaj Investment Management's cash flow shortfalls and failure to disclose the transfers and the conflicts of interest they created were materially deceptive acts to the Fund and its investors, and Defendants' failure to disclose such transfers in the Abraaj Investment Management's Quarterly Reports, the Fund's audited financial statements, or otherwise, constituted material omissions to the Fund and its investors.

## FIRST CLAIM FOR RELIEF

### Violations of Section 206(1) of the Advisers Act
(Against Abraaj Investment Management and Naqvi)

48.     The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 47 of this Complaint as if fully set forth herein.

49.     By engaging in the acts and conduct alleged in this Complaint, during the Relevant Period, Abraaj Investment Management and Naqvi were acting as investment advisers

to the Abraaj Health Fund within the meaning of Section 202(11) of the Advisers Act, 15 U.S.C.
§ 80b-2(11) because they were persons who, for compensation, engaged in the business of
advising others, either directly or through publications or writings, as to the value of securities or
as to the advisability of investing in, purchasing, or selling securities.

50.     By engaging in the acts and conduct alleged in this Complaint, Abraaj Investment
Management and Naqvi, directly or indirectly, singularly or in concert, by use of the mails or
means and instrumentalities of interstate commerce, while acting as investment advisers,
employed devices, schemes, or artifices to defraud any client or prospective client, with scienter.

51.     As investment advisers, Abraaj Investment Management and Naqvi owed the
Abraaj Health Fund a fiduciary duty of utmost good faith and had an affirmative duty to make
full and fair disclosure to them of all material facts, as well as the duty to act in the Abraaj
Health Fund's best interests, and not act in Abraaj Investment Management's and Naqvi's own
interest to the detriment of the Abraaj Health Fund.

52.     Abraaj Investment Management and Naqvi breached their fiduciary duties to the
Abraaj Health Fund and engaged in fraudulent conduct that violated Section 206(1) of the
Advisers Act, 15 U.S.C. § 80b-6(1), by knowingly or recklessly misappropriating millions of
dollars of Fund money, failing to disclose to the Fund that the money had been transferred to
Abraaj Investment Management and Abraaj Holdings, and failing to disclose the conflicts of
interests they created.

53.     By reason of the foregoing, Abraaj Investment Management and Naqvi have
violated, and unless enjoined will again violate, Section 206(1) of the Advisers Act, 15 U.S.C. §
80b-6(1).

## SECOND CLAIM FOR RELIEF

### Violations of Section 206(2) of the Advisers Act
(Against Abraaj Investment Management and Naqvi)

54.     The Commission realleges and incorporates by reference each and every

allegation contained in Paragraphs 1 through 47 of this Complaint as if fully set forth herein.

55.     By engaging in the acts and conduct alleged in this Complaint, during the

Relevant Period, Abraaj Investment Management and Naqvi were acting as investment advisers

to the Abraaj Health Fund within the meaning of Section 202(11) of the Advisers Act, 15 U.S.C.

§ 80b-2(11), because they were persons who, for compensation, engaged in the business of

advising others, either directly or through publications or writings, as to the value of securities or

as to the advisability of investing in, purchasing, or selling securities.

56.     By engaging in the acts and conduct alleged in this Complaint, Abraaj Investment

Management and Naqvi, directly or indirectly, singularly or in concert, by use of the mails or

means and instrumentalities of interstate commerce, while acting as investment advisers,

engaged in transactions, practices, or courses of business which operated as a fraud or deceit

upon any client or prospective client.

57.     As investment advisers, Abraaj Investment Management and Naqvi owed the

Abraaj Health Fund a fiduciary duty of utmost good faith and had an affirmative duty to make

full and fair disclosure to them of all material facts, as well as the duty to act in the Abraaj

Health Fund's best interests, and not act in Abraaj Investment Management's and Naqvi's own

interest to the detriment of the Abraaj Health Fund.

58.     Abraaj Investment Management and Naqvi breached their fiduciary duties to the

Abraaj Health Fund and investors and engaged in transactions, practices, or courses of business

which operated as a fraud or deceit upon any client or prospective client that violated Section

18

206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(2), by misappropriating millions of dollars of Fund money, failing to disclose to the Fund that the money had been transferred to Abraaj Investment Management and Abraaj Holdings, and failing to disclose the conflicts of interests they created.

59.     By reason of the foregoing, Abraaj Investment Management and Naqvi have violated, and unless enjoined will again violate, Section 206(2) of the Advisers Act, 15 U.S.C. § 80b-6(2).

## THIRD CLAIM FOR RELIEF

### Violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 Thereunder
(Against Abraaj Investment Management and Naqvi)

60.     The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 47 of this Complaint as if fully set forth herein.

61.     By engaging in the acts and conduct alleged in this Complaint, during the Relevant Period, Abraaj Investment Management and Naqvi were acting as investment advisers to the Abraaj Health Fund within the meaning of Section 202(11) of the Advisers Act, 15 U.S.C. § 80b-2(11), because they were persons who, for compensation, engaged in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities.

62.     The Abraaj Health Fund was a pooled investment vehicle within the meaning of Rule 206(4)-8(b) of the Advisers Act, 17 C.F.R. § 275.206(4)-8(b).  It was engaged in, held itself out as being engaged primarily, and proposed to engage itself primarily in the business of investing, reinvesting, and/or trading in securities, and thus was an investment company as defined in Section 3(a) of the Investment Company Act of 1940, 15 U.S.C. § 80a-3(a), or would

have been an investment company under that provision but for the exclusion provided from that definition under either Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act of 1940, 15 U.S.C. § 80a-3(c)(1) & (7).

63.     By engaging in the acts and conduct alleged in this Complaint, Abraaj Investment Management and Naqvi, while acting as investment advisers to the Abraaj Health Fund, which was a pooled investment vehicle, by use of the means and instrumentalities of interstate commerce and of the mails, (1) made untrue statements of material fact and omitted to state material facts necessary to make statements made, in the light of the circumstances under which they were made, not misleading, to investors and prospective investors in the pooled investment vehicles; and (2) engaged in acts, practices, and courses of business that were fraudulent, deceptive, and manipulative with respect to investors and prospective investors in pooled investment vehicles.

64.     By reason of the foregoing, Abraaj Investment Management and Naqvi have violated, and unless enjoined will again violate, Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Rule 206(4)-8(a) thereunder, 17 C.F.R. § 275.206(4)-8(a).

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that this Court issue a Final Judgment:

## I.

Finding that Defendants each violated the Federal securities laws and rules promulgated thereunder as alleged against them in this Complaint.

**II.**

Permanently enjoining Defendants and their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, directly or indirectly, from committing future violations of Section 206(1), (2), and (4) of the Advisers Act, 15 U.S.C. §§ 80b-6(1), (2), & (4), and Rule 206(4)-8(b) thereunder, 17 C.F.R. § 275.206(4)-8(b).

**III.**

Ordering Defendants to disgorge all ill-gotten gains, with prejudgment interest, as a result of the conduct alleged in this Complaint.

**IV.**

Ordering Defendants to pay civil monetary penalties pursuant to Section 209(e) o the Advisers Act, 5 U.S.C. § 80b-209(e).

**V.**

Granting such other and further relief as the Court may deem just and proper.

Dated:      April 11, 2019               Respectfully submitted,


s/*John D. Worland, Jr.*
John D. Worland, Jr. (JW-1962)
SECURITIES AND EXCHANGE
COMMISSION
100 F St., NE
Washington, DC 20549-5985
(202) 551-4438
Worlandj@sec.gov

Jan M. Folena (motion for admission *pro
hac vice* to be filed)
UNITED STATES SECURITIES AND
EXCHANGE COMMISSION
100 F St., NE
Washington, DC 20549-5985
(202) 551-4738
folenaj@sec.gov

Matthew F. Scarlato (motion for admission
*pro hac vice* to be filed)
UNITED STATES SECURITIES AND
EXCHANGE COMMISSION
100 F St., NE
Washington, DC 20549-5985
(202) 551-3749
scarlatom@sec.gov

OF COUNSEL:

Dabney C. O'Riordan
SECURITIES AND EXCHANGE
COMMISSION
444 South Flower St., Suite 900
Los Angeles, CA 90071

David A. Becker
David A. Neuman
SECURITIES AND EXCHANGE
COMMISSION
100 F St., NE
Washington, D.C. 20549-5985